UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                                        <u>ORDER</u>

        - against -                    07-MJ-1193 (MDG)


RICHARD KNAUER,

                    Defendant.

- - - - - - - - - - - - - - - - - - X

GO, United States Magistrate Judge:

        Defendant Richard Knauer is charged with engaging in

commercial fishing in violation of 36 C.F.R. § 2.3(d)(4) and

harming/harassing wildlife in violation of 36 C.F.R.

§ 2.1(a)(1)(i) for harvesting horseshoe crabs from the waters of

Jamaica Bay, a unit of Gateway National Recreation Area

("Gateway").  By notice of motion filed on November 13, 2007,

defendant moved to dismiss the charges, arguing that he engaged

in lawful "commercial fishing" and "fishing" at Gateway.  <u>See</u> ct.

doc. 3.  Following oral argument and supplemental briefing by the

parties, this Court issued an electronic order on April 21, 2008

denying the motion and indicating that the rulings would be set

forth in a separate order or rulings on the record.

        At the conclusion of a bench trial held on April 23, 2008,

the defendant made an oral motion for a judgment of acquittal on

the commercial fishing charge because horseshoe crabs are not "fish" within the meaning of 36 C.F.R. § 1.4(a). This Court reserved judgment. After consideration of the evidence and law, this Court makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

The following findings of fact are based on the exhibits admitted and testimonies of the witnesses presented at trial, all of whom I found to be credible. The government called Kim McKown, a unit leader of the New York State Department of Environmental Conservation ("DEC"), and four employees of the United States Park Service working at Gateway: Donna Harding, a budget analyst in the Jamaica Bay Unit; Park Service Officers Timothy Cosgro and Christopher Pickel; and Lisa Eckert, Superintendent of the Jamaica Bay Unit of Gateway National Recreation Area. Defendant, who waived his attendance at trial but participated by telephone, called Dr. William Velhager, Assistant Professor of Biology at New York University.

Gateway National Recreation Area consists of the "lands, waters, marshes, and submerged lands in the New York Harbor area" extending from Jamaica Bay in the southern part of Queens and Brooklyn, along the southern side of Staten Island to Sandy Hook, New Jersey. 16 U.S.C. § 460cc(a). The Jamaica Bay Unit of Gateway includes "the islands, marshes, hassocks, submerged lands, and waters in Jamaica Bay, Floyd Bennett Field," and "the lands within one-fourth mile of the mean low water line" in "the

area of Jamaica Bay to the shoreline of John F. Kennedy International Airport." 16 U.S.C. §§ 460cc(a)(1) and (6).

Defendant Richard Knauer resides in Sheepshead Bay, Brooklyn and was the holder of a commercial fishing permit issued by New York State that is valid through December 31, 2009 and permits the commercial harvesting of crabs, including horseshoe crabs.

On May 29, 2007, United States Park Police Officers Timothy Cosgro and Christopher Pickel saw Knauer on a fishing boat within the federal waters of Jamaica Bay, approximately one mile from state waters to the east and two miles from state waters running in a channel to the west, taking horseshoe crabs out of the Bay with a gaff. After they pulled alongside and boarded Mr. Knauer's vessel, the officers saw that the vessel was filled with over 70 horseshoe crabs piled several layers deep on the boat bottom. Explaining to Officer Cosgro that he was a commercial fisherman "just trying to make a living," Knauer produced a New York State Commercial Fishing License. Officer Cosgro advised that the permit was not valid in the federally protected waters of Jamaica Bay and directed the defendant to throw the horseshoe crabs overboard. Although Officer Cosgro proceeded to write out two summonses, the defendant did not remove any horseshoe crabs from the boat.[1] After he completed writing, Officer Cosgro

---

[1] David Klem stated in support of the defendant's motion to dismiss that his client claimed that he "ultimately acquiesced and threw the crabs overboard." Affirmation of David Klem dated November 12, 2007 (ct. doc. 3) at ¶ 9. However, even if this hearsay statement were admissible, I credit the testimonies of
(continued...)

handed the two summonses to Mr. Knauer and explained what the defendant had to do. The defendant then headed away in his boat in a northerly direction.

Prior to May 29, 2007, neither Officer Cosgro nor Donna Harding had ever observed people engaged in commercial fishing or the harvesting of horseshoe crabs or other wildlife in Jamaica Bay.

Animals commonly known as fish are classified with other vertebrates under phylum *chordata*. Fish are further classified within this phylum into classes known as *Agnatha*, *Osteichthyes* (bony fishes such as eels and goldfish) and *Chondrichthyes* (cartilaginous fish such as sharks and rays). Mollusks, which include snails, clams and squid, are in phylum *Mollusca* while crustaceans such as shrimp and lobsters are in a subphylum of phylum *Arthropoda*. Horseshoe crabs, which are more closely related to spiders and scorpions, are classified in subphylum *Chelicerata* of phylum *Arthropoda*. Although horseshoe crabs are not scientifically classified as crustaceans, Ms. McKown testified that the DEC, the agency in New York State responsible for regulating wildlife, manages horseshoe crabs as crabs.

Superintendent Eckert testified that the taking of wildlife or hunting is prohibited at Gateway. Prior to May 29, 2007, Superintendent Eckert had issued a compendium further regulating use and conduct at the Jamaica Bay Unit in exercise of her

---

[1](...continued)
both officers that no crabs were thrown back into the water.

-4-

discretionary authority under the governing statutory and

regulatory scheme.  The Compendium provided that "hunting . . .

[and] the taking of . . . horseshoe crab are prohibited

throughout the Jamaica Bay Unit."[2]  Further, the informational

---

[2] The Superintendent's Compendium available on the NPS's
website is dated June 28, 2007.  See
http://www.nps.gov/gate/parkmgmt/upload/COMPENDIUM%20GATE%20JBU%2
006282007.pdf.  As a result, on May 7, 2008, I ordered the
government to produce a copy of the Superintendent's Compendium
that was in effect on May 29, 2007.  Ct. doc. 17.  Both versions
of the Compendium contain identical prohibitions of hunting and
the taking of horseshoe crabs in the Jamaica Bay Unit.  There is
no evidence as to whether the Superintendent's Compendium was
posted on the National Park Service's ("NPS") website on May 29,
2007.  However, it was available to the public upon request.  See
36 C.F.R. § 1.7(b).
     The defendant objected to this Court's May 7, 2008 order on
various grounds none of which have merit.  First, it is long
established that courts may take judicial notice of the rules and
regulations of an administrative agency, including in criminal
cases.  See, e.g., Lilly v. Grand Truck Western Co., 317 U.S.
481, 488-89 (1943); Thornton v. United States, 271 U.S. 414, 420
(1921); Caha v. United States, 152 U.S. 211, 221-22 (1894);
Christman v. Skinner, 468 F.2d 723, 726 (2d Cir. 1972); United
States v. Fried, 149 F.2d 1011, 1014 (2d Cir. 1945); see also
United States v. Penn Foundry & Mfg. Co., 337 U.S. 198, 216
(1949) (Douglas, J., concurring) (official communications
disclosing policy, such as reports, rules and regulations of an
agency are reliable and authoritative and need not be proven).
The court may take such judicial notice at the request of a party
or sua sponte.  See United States v. Harris, 331 F.2d 600, 601
(6th Cir. 1964); Green v. United States, 176 F.2d 541 (1st Cir.
1949).  Judicial notice of such documents may be taken after a
trial and for the first time on appeal.  See Denius v. Dunlap,
330 F.3d 919, 926-27 (7th Cir. 2003); United States v. Eagleboy,
200 F.3d 1137, 1140 (8th Cir. 1999).  Authentication of such a
document is not required.  See Ray v. Aztec Well Serv., 748 F.2d
888, 889 n.2 (10th Cir. 1984).  Finally, the government was not
required to disclose the document pursuant to Fed. R. Crim. P.
16(a)(1)(e) any more than the government was required to disclose
provisions of the Code of Federal Regulations.  Cf. Newcomb v.
Brennan, 558 F.2d 825, 829 (7th Cir. 1977) ("matters of public
record such as state statutes, city charters and city ordinances
fall within the category of 'common knowledge' and are therefore
proper subjects of judicial notice").

brochure for the Gateway National Recreation Area, which included a map of the park and was available at all the park's visitor center offices, included a warning that "[a]ll natural and cultural resources, including wildlife, rocks, plants and structures are protected by federal law. Do not disturb or destroy." Govt.'s Exh. 12.

DISCUSSION AND
<u>CONCLUSIONS OF LAW</u>

<u>Background</u>

Mr. Knauer is charged with violating two provisions contained in Chapter I to Title 36 of the Code of Federal Regulations (the "regulations"), which govern, <u>inter alia</u>, conduct within "[t]he boundaries of federally owned lands and waters administered by the National Park Service." <u>See</u> 36 C.F.R. § 1.2(a)(1). The terms used in Chapter I are defined in section 1.4(a), unless otherwise modified by a particular part or regulation. <u>Id.</u> Under section 1.4(a), the term "fishing" is defined as "taking or attempting to take fish." "Fish" are defined as any member of the subclasses *Agnatha*, *Chondrichthyes*, or *Osteichthyes*, or any mollusk or crustacean found in salt water. "Wildlife" is defined as "any member of the animal kingdom and includes a part, product, egg or offspring thereof, or the dead body or part thereof, except fish." By these definitions, all members of the animal kingdom are categorized as either "fish" or "wildlife."

It is undisputed that horeshoe crabs are in the subphylum *Chelicerata* rather than in any of the categories listed in the definition of "fish" in section 1.4(a). Thus, I find for purposes of Title 36, Chapter I, that horseshoe crabs are classified as "wildlife" and not as "fish." In fact, Lisa Eckert, the Superintendent of the Jamaica Bay Unit and a government witness, concurred with this classification.

"Commercial Fishing" Charge

Section 2.3 of the regulations contains provisions which, inter alia, regulate practices, methods and locations for fishing. See 36 C.F.R. § 2.3. Mr. Knauer is charged with violating section 2.3(d)(4), which prohibits "[c]ommercial fishing, except where specifically authorized by Federal statutory law." Since "fishing" is defined in section 1.4(a) as the "taking or attempting to take fish" and since, as discussed above, horseshoe crabs are not "fish," I conclude that the government has not proved that the defendant took any fish or engaged in "fishing," as regulated under section 2.3.

The government argues that the broader definition of "commercial fishing" provided in section 7.45(c) applies here. See 36 C.F.R. § 7.45(c)(3) (defining "commercial fishing" as taking or harvesting any form of "fresh or salt water acquatic life for the purpose of sale or barter"). However, section 7.45 clearly applies only to Everglades National Park. See Lesoeur v. U.S., 21 F.3d 965, 968 (9th Cir. 1994) ("regulations in Part 7 of Chapter 36 are special regulations for specific park areas"); 36

C.F.R. § 1.2(c).  Alternatively, the government argues that the broader state law definition of "commercial fishing" should be incorporated into section 2.3(d)(4).  Under the Supremacy Clause, federal law supercedes conflicting state law.[3]  See U.S. v. Brown, 552 F.2d 817, 823 (8th Cir. 1977).  The Secretary of the Interior has provided that only non-conflicting state laws are permitted to be incorporated into section 2.3.  See 36 C.F.R. § 2.3(a).  The state law definition of "commercial fishing" clearly conflicts with the definitions of "fish" and "fishing" in section 1.4(a) and cannot apply here.

Since the government has not offered a persuasive argument for reading the definitions of "fish" and "fishing" in section 1.4 out of the phrase "commercial fishing" as used in section 2.3(d)(4), I find that defendant did not take fish.  Accordingly, I grant defendant's motion for a judgment of acquittal on the charge that he engaged in commercial fishing in violation of section 2.3(d)(4).

Before trial, defendant moved to dismiss this charge principally on the ground that he was engaging in permissible commercial fishing, which is not banned by the enabling statute for Gateway.  Although I denied defendant's motion in an

_____

[3] For the same reason, the defendant's argument that his New York state commercial fishing license entitled him to take horseshoe crabs from a national park must fail.  U.S. v. Lofton, 233 F.3d 313, 317 (4th Cir. 2000) ("While carrying a shotgun might under proper circumstances be perfectly legal according to Maryland law, it is not allowed in national parks . . . ."); U.S. v. Gettier, No. 7:08-po-0024, 2008 WL 822073, at *4 (W.D. Va. Mar. 25, 2008).

electronic order and stated that a written opinion would be
forthcoming, I now deny that motion as moot.

Harming/Harassing Wildlife Charge

Section 2.1(a)(1)(i) prohibits "[p]ossessing, destroying,
injuring, defacing, removing, digging, or disturbing from its
natural state: . . . living or dead wildlife or fish," "except as
otherwise provided in" Chapter I.  The defendant does not dispute
that he removed wildlife.  Instead, he argues that he did not
violate section 2.1(a)(1)(i) since his harvesting of horseshoe
crabs from Jamaica Bay constituted "hunting"[4] permitted under
section 2.2(b)(1) of the regulations.

Section 2.2(b)(1) authorizes "hunting . . . in park areas
where such activity is specifically mandated by federal statutory
law."  In the legislation authorizing the creation of Gateway,
Congress provided that "[t]he Secretary [of the Department of the
Interior] shall permit hunting, . . . on the lands and waters
under his jurisdiction within the Gateway National Recreation
Area . . . *except that the Secretary may designate zones where
and establish periods when these activities may not be permitted
for reasons of public safety, administration, fish or wildlife
management, or public use and enjoyment*."  16 U.S.C. § 460cc-2(f)
(emphasis added).  The language of the enabling statute makes
clear that the right to hunt at Gateway is qualified and subject

_____

[4] "Hunting" is defined under the regulations as the "taking
or attempting to take wildlife, except trapping."  36 C.F.R.
§ 1.4.

to the discretionary exercise of authority by the Secretary to protect wildlife.[5]  Consistent with these concerns, the NPS explained in its commentary to proposed section 2.2(b) of the regulations, which was later promulgated in identical form in the final and existing regulations, that "[i]n those park areas where the legislation directs that hunting or trapping be permitted, the Service will implement the types of restrictions necessary to ensure resource protection and public safety."  47 Fed. Reg. 11598, 11601 (Mar. 17, 1982).

Exercising her discretionary authority, the Superintendent of the Jamaica Bay Unit issued rules prohibiting hunting and the taking of horseshoe crabs in the Jamaica Bay Unit.  This exercise of discretion is consistent with the mandate of the Gateway enabling statute that the Secretary "administer and protect the islands and waters within the Jamaica Bay Unit with the primary aim of conserving the natural resources, fish and wildlife located therein."  16 U.S.C. § 460cc-2.  The protection of horseshoe crabs is also consistent with the legislative intent expressed in the House Report to the Gateway statute recognizing that the park "provides an excellent habitat for a  . . . multitude of migrating waterfowl and wading, shore and marsh birds."  H. Rep. No. 92-1392 (1972), as reprinted in 1972

---

[5] The enabling legislation creating many of the national recreation areas, lakeshores and seashores includes nearly identical language.  See, e.g., 16 U.S.C. §§ 460m-10 (Buffalo National River), 460o-5 (Delaware Water Gap National Recreation Area), 460t-3 (Bighorn Canyon National Recreation Area), 460w-4 (Apostle Islands National Lakeshore).

U.S.C.C.A.N. 4882, 4885.  Indeed, Superintendent Eckert explained that the protection of the horseshoe crab is important to the preservation of migratory shore birds that stop at Gateway as they migrate from South America to the Canadian Arctic.  <u>See generally</u> <u>Am. Bird Conservancy v. Kempthorne</u>, 559 F.3d 184, 185-86 (3d Cir. 2009) (discussing relationship between the decline in the red knot population and the harvesting of horseshoe crabs for commerical purposes).  Since the evidence is indisputable that the defendant took horseshoe crabs from the Jamaica Bay Unit despite the specific restrictions in the Superintendent's Compendium and the general prohibition on the taking of wildlife in section 2.1(a)(1)(i), I find that he violated section 2.1(a)(1)(i).

The defendant argues that the Superintendent's restrictions are invalid because they were not the product of notice and comment rulemaking.  As a general matter, the Administrative Procedure Act exempts matters relating to "public property" from its notice and comment provisions.  <u>See</u> 5 U.S.C. § 553(a)(2).  However, when a Superintendent seeks to impose restrictions which are "of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area . . . or is of a highly controversial nature," such restrictions must first "be published as rulemaking in the FEDERAL REGISTER." 36 C.F.R. § 1.5(b).  The defendant has not submitted any evidence to demonstrate, nor is there any basis to find, that the restrictions at issue here had a major impact on visitor use

patterns or were of a highly controversial nature.  In fact,
Donna Harding, a government witness, who has worked in the
Jamaica Bay unit for seven years and resides and fishes in the
area, had never seen anyone take horseshoe crabs from the
vicinity.  Moreover, the prohibitions on hunting and the taking
of horseshoe crabs were contained in the Superintendent's
Compendium available to the public upon request and the
protection of wildlife in the park was noted in the park's
brochure.  <u>See</u> Govt.'s Exh. 12.  The Superintendent satisifed the
public notice requirements of section 1.7 of the regulations
through "use of . . . park brochures."

Defendant further argues that the use and activity
restrictions are invalid because the Gateway enabling statute
grants the authority to promulgate use restrictions to the
Secretary of the Interior rather than the Superintendent of the
Jamaica Bay Unit.  However, the Secretary of the Department of
the Interior has expressly delegated to park superintendents her
discretionary authority to manage fish and wildlife in section
1.5(a) of the regulations.  This section provides that if
"necessary for the . . . protection of environmental or scenic
values, protection of natural or cultural resources, aid to
scientific research, implementation of management
responsibilities, equitable allocation and use of facilities, or
the avoidance of conflict among visitor use activities, the
[park] superintendent may: (1) [e]stablish, for all or a portion
of a park area, a reasonable schedule of visiting hours, impose

public use limits, or close all or a portion of a park area to all public use or to a specific use or activity[; or] (2) [d]esignate areas for a specific use or activity, or impose conditions or restrictions on a use or activity." 36 C.F.R. § 1.5(a); see also 36 C.F.R. § 2.2(c) ("the superintendent shall consult with appropriate State agencies before invoking the authority of § 1.5 for the purpose of restricting hunting and trapping or closing park areas to the taking of wildlife where such activities are mandated or authorized by Federal statutory law"). In addition, the Secretary has promulgated regulations specifically permitting a park superintendent to prohibit hunting at designated times and locations in those parks where hunting is expressly authorized by statute. See 43 C.F.R. § 24.4(f).

The Superintendent's regulations clearly were properly issued pursuant to the authority delegated by the Secretary and in compliance with the requirement in the enabling statute for Gateway that the Secretary "designate zones where" hunting "may not be permitted . . . for reasons of . . . wildlife management, or public use and enjoyment." See 16 U.S.C. § 460cc-2. Courts have recognized that "[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." United States Telecom Ass'n v. F.C.C., 359 F.3d 554, 565 (D.C. Cir. 2004). Here, the Gateway statute does not prohibit subdelegation and the enormity of the task of promulgating use restrictions for the

entire national park system suggests that Congress intended to permit subordinate officers to exercise such authority. <u>See</u> <u>United States v. Mango</u>, 199 F.3d 85, 91-92 (2d Cir. 1999) ("magnitude of the task of issuing permits suggests that Congress intended to allow subordinate Corps officials to issue permits and specify permit conditions"); <u>United States v. Matherson</u>, 367 F. Supp. 779, 781 (E.D.N.Y. 1973) (in carrying out the duty to preserve a park's natural resources, "the Secretary may appoint subordinate officials and subdelegate to them the necessary power needed to perform the day to day operations of the National Seashore"), <u>aff'd</u>, 479 F.2d 1399 (2d Cir. 1974). Thus, the Superintendent is empowered to exercise her subdelegated power to promulgate rules restricting the use of the Jamaica Bay Unit in order to preserve the natural resources of the park.

Moreover, defendant's argument that commercial harvesting of horseshoe crabs constitutes permissible "hunting" is simply contrary to the legislative and regulatory scheme applicable here. Nothing in the legislative and regulatory history of the national park system and Gateway, specifically, suggest that authorized "hunting" is intended to encompass any activity other than recreational hunting.

Congress established the NPS in 1916 to administer the national park system. <u>See</u> <u>Universal Intepretive Shuttle Corp. v. Wash. Metropolitan Area Transit Comm.</u>, 393 U.S. 186, 187 & n.1 (1968). The NPS was charged with the responsibility "to conserve the scenery and the natural and historic objects and the wildlife

-14-

[in the national parks] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  16 U.S.C. § 1.  Towards that goal, Congress has authorized the NPS to, inter alia, "promulgate and enforce regulations concerning boating and other activities on or relating to waters located within areas of the National Park System, including waters subject to the jurisdiction of the United States."  16 U.S.C. § 1a-2(h).  Congress also specified  that "[t]he authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established except as may have been or shall be directly and specifically provided by Congress."  Id. § 1a-1.

In 1936, shortly after the passage of the Federal Register Act, which authorized administrative agencies to promulgate regulations, the NPS expressly prohibited the taking of wildlife in all national parks.  See 1 Fed. Reg. 672, 673 (June 27, 1936).  In 1964, the park system was divided into three categories, natural, historical and recreational, in recognition of the different purposes for which the parks were created.  See Michigan United Conservation Clubs v. Lujan, 949 F.2d 202, 204-05 (6th Cir. 1991).  Not surprisingly, the "recreational" areas were created "primarily for the purpose of public recreation."  31

-15-

Fed. Reg. 16650, 16651 (Dec. 29, 1966).  Since the recreation
areas accommodated multiple uses, both conservation and
recreation, the Park Service began to permit hunting if otherwise
in accordance with local laws and regulations.  Id. at 16655.

In 1983, the NPS amended its regulations to prohibit the
taking of wildlife and permit hunting only where specifically
authorized by Congress.  The NPS explained that "[t]hese rules
provide guidance and controls for public use and recreation
activities (e.g., camping, fishing, hunting, winter activities,
boating) in areas administered by the National Park Service."  48
Fed. Reg. 30252, 30252 (June 30, 1983).  The NPS further "noted
that the service recognizes the high public value associated with
outdoor recreation and fully intends to comply with the
legislative history governing intended public use of these
areas."  48 Fed. Reg. at 30253.

The Gateway enabling statute directs the NPS to act "with
the primary aim of conserving the natural resources, fish and
wildlife" of Gateway.  16 U.S.C. § 460cc-2(a).  It would be
anomalous that the term "hunting" would be construed to permit
commercial harvesting rather than recreational hunting given the
statute's purpose.  In fact, the House Committee recognized that
Jamaica Bay "is considered to be an ecological treasure . . . .
Since the area is primarily marshland and water area, most of it
will be retained in its relatively natural state for the
enjoyment of fishermen, nature observers, and boaters . . . ."
H. Rep. No. 92-1392 (1972), as reprinted in 1972 U.S.C.C.A.N.

-16-

4882, 4885.  As one court stated in discussing Everglades National Park, "[c]ommercial exploitation of the natural resources is not one of the purposes for which Congress established the Park" and thus the NPS may implement measures to "enhance the use of the [P]ark by recreational users." Organized Fishermen of Florida v. Watt, 590 F. Supp. 805, 814 (S.D. Fla. 1984), aff'd, 775 F.2d 1544 (11th Cir. 1985).

Indeed, "[w]here Congress has intended to permit commercial [activity] in a national park, it has done so expressly by statute."  Organized Fishermen, 775 F.2d at 1548; see also Alaska Wildlife Alliance v. Jensen, 108 F.3d 1065, 1071 (9th Cir. 1997). For example, the statute creating Jean Lafitte National Historical Park provides that "[w]ithin the Barataria Marsh Unit, the Secretary shall permit hunting, fishing (including commerical fishing) . . . '"  16 U.S.C. § 230d; see also 16 U.S.C. § 459a-1 ("the legal residents of villages [within the seashore] shall have a right to earn a livelihood by fishing within the boundaries [of the Seashore], subject to such rules and regulations as the . . . Secretary may deem necessary . . . ."); 16 U.S.C. § 410hh-4 ("the Secretary may take no action to restrict unreasonably the exercise of valid commerical fishing rights or privileges obtained pursuant to existing law . . . ."); 16 U.S.C. § 396d ("Commercial, recreational and subsistence fishing . . . shall be permitted wherever such activities are not inconsistent with the purpose for which the park is established, subject to regulation by the Secretary.").  Similarly, other

commercial activities in derogation of the NPS's conservation mission are specifically authorized by Congress such as grazing and the sale and removal of timber.  See 16 U.S.C. §§ 202, 203 (Lassen Volcanic National Park); 271b (Canyonlands National Park); 53-54 (Yosemite National Park).  That Congress was explicit in other statutes when it intended to grant permission for commercial activity in a national park implies that Congress did not intend to grant permission for commercial activity at Gateway.  See Alaska Wildlife, 108 F.3d at 1071; Michigan United Convervation, 949 F.2d at 208; see also Lukhard v. Reed, 481 U.S. 368, 376-377 (1987).  Rather, congressional silence on the issue suggests that permission for commercial activity was left to the NPS's broad authority to administer the national parks.  See Alaska Wildlife, 108 F.3d at 1071-74; Organized Fishermen, 590 F. Supp. at 812-13.  The NPS has exercised that authority by prohibiting commercial activity in the national parks except where specifically authorized by Congress.  See 36 C.F.R. § 5.3.[6]

The Second Circuit's reasoning in United States v. Duffy, 479 F.2d 1038 (2d Cir. 1973), supports the distinction between recreational hunting and hunting for a commercial purpose. There, the court upheld the defendant's conviction for commerical fishing at Fire Island National Seashore in violation of 36

---

[6] "Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited."  36 C.F.R. § 5.3.

C.F.R. § 5.3 despite statutory language identical to that of the Gateway statute: "[t]he Secretary shall permit hunting, fishing, and shellfishing . . . within the Fire Island National Seashore . . . ." See 16 U.S.C. § 459e-4. The Second Circuit found that commercial fishing was prohibited by section 5.3 because "[i]t is the business activity, not the fishing, which the regulation prohibits." 479 F.2d at 1039.[7]

For the reasons set forth above, I reject defendant's arguments and find him guilty of violating 36 C.F.R. § 2.1(a)(1)(i).

Right to Speedy Trial

By letter dated April 24, 2009, the defendant moves to dismiss the charges in this case on the grounds that Mr. Knauer's Sixth Amendment right to a speedy trial has been violated by the delay between the trial and a verdict in this case. Ct. doc. 22. The defendant claims the delay in rendering a verdict is unreasonable and that he is prejudiced by the existence of pending federal charges, the uncertainty as to the lawfulness of aspects of his business and the effect of the passage of time on the Court's ability to render a proper verdict.

Courts apply a four factor test to a defendant's constitutional speedy trial claim: 1) length of delay; 2) the reason for the delay; 3) the defendant's assertion of his right;

_____

[7] This case preceded the promulgation of section 2.3(d)(4) which specifically prohibits "commercial fishing."

and 4) prejudice to the defendant." U.S. v. Abad, 514 F.3d 271,
274 (2d Cir. 2005).  Although none of the four factors is "a
necessary or sufficient condition to the finding of a deprivation
of the right of speedy trial," Barker v. Wingo, 407 U.S. 514, 533
(1972), prejudice "frequently weighs heaviest in considering a
speedy trial challenge," Mackenzie v. Portuondo, 208 F. Supp. 2d
302, 315 (E.D.N.Y. 2002).

As to the length of the delay, courts have denied motions
to dismiss involving far longer delays than the less than fifteen
months between trial and a verdict in this case.  See Barker, 407
U.S. at 533-34 (over 5 years); Abad, 514 F.3d at 274 (31 months);
Flowers v. Warden, 853 F.2d 131, 133 (2d Cir. 1988) (17 months);
U.S. v. McGrath, 622 F.2d 36, 41 (2d Cir. 1980) (2 years);
Warwick v. Kuhlmann, No. 98 Civ. 6393, 2003 WL 22047883, at *3
(S.D.N.Y. Aug. 29, 2003) (27 months).  Perhaps most importantly,
defendant's claim of prejudice does not rise to the level courts
have found persuasive in finding a speedy trial violation.  See
U.S. v. New Buffalo Amusement Corp., 600 F.2d 368, 379 (2d Cir.
1979) (crucial defense witnesses could not be located); U.S. v.
Vispi, 545 F.2d 328, 334-35 (2d Cir. 1976) (old records and
"dimmed recollections"); U.S. v. Roberts, 515 F.2d 642, 646 (2d
Cir. 1975) (government delay disqualified defendant for youthful
offender status).  The defendant has simply not presented
circumstances that are sufficient for a finding of a deprivation
of the right to a speedy trial based on the delay between the
trial and a verdict.

<u>CONCLUSION</u>

For the foregoing reasons, I find the defendant not guilty of violating 36 C.F.R. § 2.3(d)(4) but guilty of violating 36 C.F.R. § 2.1(a)(1)(i).  The defendant is directed to pay a fine of $275.00.

**SO ORDERED.**


Dated:    Brooklyn, New York
          July 14, 2009


                                    /s/
                                    _____
                                    MARILYN DOLAN GO
                                    UNITED STATES MAGISTRATE JUDGE