UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

UNITED STATES OF AMERICA,

        -against-

RICHARD KNAUER,

                Defendant.

-------------------------------------------------x

<u>MEMORANDUM AND ORDER</u>
09-CR-586 (ILG)

GLASSER, United States Senior District Judge:

Defendant appeals a criminal conviction imposed after a bench trial before Magistrate Judge Marilyn D. Go. For the reasons stated below, defendant's conviction is vacated and a judgment of acquittal is entered.

## FACTS[1]

Defendant Richard Knauer ("Knauer") is a fisherman with a valid New York State commercial fishing permit which allows the commercial harvesting of horseshoe crabs. On May 25, 2007, Knauer was engaged in the harvesting of horseshoe crabs within the waters of the Jamaica Bay Unit of the Gateway National Recreation Area ("Gateway"). After receiving a phone call reporting Knauer's activities, two United States Park Police Officers approached Knauer's fishing boat in their own vessel. After witnessing Knauer catching horseshoe crabs, and observing some 50 to 80 crabs already in his boat, they informed him that his activities were illegal. They then issued Knauer two misdemeanor summonses: commercial fishing in violation

---

[1] The following facts are undisputed.

1

of 36 C.F.R. § 2.3(d)(4) and harming or harassing wildlife in violation of 36 C.F.R.

§ 2.1(a)(1)(i).

## PROCEDURAL HISTORY

On April 23, 2008, a bench trial was held before Magistrate Judge Go. At his trial,

Knauer did not dispute the government's description of his actions on May 25, 2007, but rather

challenged the legal authority under which he had been charged. First, Knauer argued that,

under federal law, horseshoe crabs are not technically fish, and thus he could not be guilty of

commercial fishing. Second, he argued that there was no regulation which actually prohibited

the taking of horseshoe crabs in Jamaica Bay. At the conclusion of trial, Knauer made a motion

for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, arguing

that, on the basis of the evidence presented at trial, he could not be found guilty of commercial

fishing. Magistrate Judge Go reserved judgment on this motion.

On May 7, 2008, Magistrate Judge Go requested from the government a copy of the

version of the Jamaica Bay Unit Compendium, a collection of regulations issued by the Jamaica

Bay Unit of the Gateway National Park, in effect on May 29, 2007. Knauer promptly objected to

this request on the grounds that it was an impermissible reopening of the trial and that the court

could not take judicial notice of the Compendium. The government subsequently provided

Magistrate Judge Go with a copy of the Compendium dated May 25, 2007. On July 14, 2009,

Magistrate Judge Go issued a decision. United States v. Knauer, 635 F. Supp. 2d 203 (E.D.N.Y.

2009). She acquitted Knauer of the commercial fishing charge, finding that horseshoe crabs are

not fish for purposes of federal law,[2] but found Knauer guilty of harming or harassing wildlife,

---

[2] The Secretary of the Interior's regulations define fish as "any member of the subclasses Agnatha, Chondrichthyes, or Osteichthyes, or any mollusk or crustacean found in salt water." 36 C.F.R. § 1.4(a). Horseshoe crabs are

relying primarily on a regulation found in the Compendium banning the hunting of horseshoe crabs, and imposed a $275 fine. On August 19, 2009, Knauer appealed this conviction, and, on April 9, 2010, oral argument was heard.

## DISCUSSION

Knauer raises several arguments in support of his appeal. He first argues that the Compendium on which the magistrate judge relied was not properly admitted into evidence, was not subject to judicial notice, and thus could not properly provide the basis for his conviction. He then argues that, assuming the Compendium was properly considered, the regulation which banned the hunting of horseshoe crabs was not lawfully promulgated and was therefore invalid. Finally, he argues that, in the absence of the Compendium, there is no statutory or regulatory authority which would ban the harvesting of horseshoe crabs in Jamaica Bay.

The government argues that the Compendium was properly before the court and that its regulations were valid and thus supported Knauer's conviction. The government further argues, however, that even if the Compendium cannot be considered, federal law independently prohibits the activity Knauer was engaged in. The government has not challenged Knauer's acquittal on the commercial fishing charge.

### 1. Standard of Review

This Court has jurisdiction over Knauer's appeal under Rule 58(g)(2)(B) of the Federal Rules of Criminal Procedure. In an appeal of a criminal conviction by a magistrate judge, "the

members of the subphylum *Chelicerata* of the phylum *Arthropoda*, and thus, unlike true crabs or lobster, are not fish for purposes of federal law. Fishing is defined as "taking or attempting to take fish," id., and thus does not include the taking of horseshoe crabs. Magistrate Judge Go held that the term "commercial fishing," which is not defined in the regulations, should be interpreted to incorporate the definition of "fishing," and thus the commercial harvesting of horseshoe crabs would not be commercial fishing. The government has not appealed this decision.

3

scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). The court of appeals "review[s] *de novo* the district court's legal conclusions and accept[s] its factual determinations, unless clearly erroneous, viewing those facts in the light most favorable to the government." United States v. Gandia, 424 F.3d 255, 261 (2d Cir. 2005).

## 2. Federal Statutory and Regulatory Provisions

### a. Prohibition on Harming or Harassing Wildlife

The government argued at trial and continues to argue in its brief that, even without considering the Jamaica Bay Unit Compendium, Knauer's conduct violated 36 C.F.R. § 2.1(a)(1)(i). According to the government, the regulations implemented by the Secretary of the Interior ("the Secretary") considered together with the federal statute that established Gateway are sufficient to criminalize the taking of horseshoe crabs within Gateway.

Because there is considerable dispute between the parties regarding the legitimacy and admissibility of the regulations contained in the Compendium,[3] and because the government's argument at trial did not rely on the Compendium,[4] the Court first considers whether Knauer's conviction may be upheld even absent the contested Compendium regulation.

Knauer was charged with a violation of 36 C.F.R. § 2.1(a)(1)(i), which provides, in relevant part:

---

[3] These issues are discussed at length below.

[4] Indeed, the government did not rely on the Compendium regulations at any point prior to or during trial. Rather, the government relied at trial on two separate theories of Knauer's guilt: (1) under 36 C.F.R. § 2.2(b)(2) hunting was prohibited by default in Gateway absent specific authorization, and (2) the Gateway Enabling Act's authorization of hunting implicitly excludes commercial activities. The magistrate judge convicted Knauer primarily under a third theory, that a regulation promulgated by the Jamaica Bay Superintendent and published in the Compendium prohibited Knauer's conduct, but she also endorsed the government's second theory regarding commercial activities. The magistrate judge explicitly did *not* adopt the government's first theory, holding instead that hunting was authorized by default at Gateway under 36 C.F.R. § 2.2(b)(1). Knauer, 635 F. Supp. 2d at 208.

(a) Except as otherwise provided in this chapter, the following is prohibited: (1) Possessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state: (i) Living or dead wildlife or fish, or the parts of products thereof, such as antlers or nests.

The Secretary, under his authority to administer the national parks, has promulgated a number of regulations which apply to the parks generally, including definitions of various terms used throughout the regulations. The terms "fish," "wildlife," "fishing," and "hunting" are defined as follows:

Fish means any member of the subclasses Agnatha, Chondrichthyes, or Osteichthyes, or any mollusk or crustacean found in salt water.

Wildlife means any member of the animal kingdom and includes a part, product, egg or offspring thereof, or the dead body or part thereof, except fish.

Fishing means taking or attempting to take fish.

Hunting means taking or attempting to take wildlife, except trapping.

36 C.F.R. § 1.4(a) (in relevant part, reordered for clarity). Thus, the animal kingdom is divided into two mutually exclusive classes, fish and wildlife, and the taking of fish and the taking of wildlife are classified as fishing and hunting, respectively. As Magistrate Judge Go found, and neither party disputes, horseshoe crabs belong to the subphylum *Chelicerata*, and not to any of the categories listed in the definition of fish in 36 C.F.R. § 1.4(a). As such, they are properly classified as wildlife rather than fish, and the taking of horseshoe crabs would be classified as hunting, not fishing.[5]

The provision Knauer was charged of violating, 36 C.F.R. § 2.1(a)(1)(i), protects both wildlife and fish, and thus would prohibit both hunting and fishing. This prohibition, however,

---

[5] Magistrate Judge Go also found that the phrase "commercial fishing," which is not defined in the regulations, incorporates the definition of "fishing" and thus does not cover the taking of horseshoe crabs. The government argued that "commercial fishing" is a non-compositional phrase which should be interpreted more broadly than "fishing." Because the government did not appeal Knauer's acquittal on the commercial fishing charge, the Court need not consider this question.

applies "[e]xcept as otherwise provided in this chapter." 36 C.F.R. § 2.1(a)(1)(i). It is necessary

then, to consider whether Knauer's activities were otherwise provided for. Hunting is

specifically addressed under 36 C.F.R. § 2.2(b), which provides:

> (1) Hunting *shall* be allowed in park areas where such activity is *specifically mandated* by Federal statutory law.
>
> (2) Hunting *may* be allowed in park areas where such activity is *specifically authorized as a discretionary activity* under Federal statutory law if the superintendent determines that such activity is consistent with public safety and enjoyment, and sound resource management principles. Such hunting shall be allowed pursuant to special regulations.

36 C.F.R. § 2.2(b)(1)–(2) (emphasis added).

This provision distinguishes between park areas where hunting is "specifically mandated

by Federal statutory law," id. at (1), and those where it is "specifically authorized as a

discretionary activity under Federal statutory law," id. at (2). In the former, hunting "shall be

allowed" as mandated while in the latter, it "may be allowed" if authorized by the park

superintendent. Id. at (1)–(2). Thus, the first step in the Court's analysis is to determine the

statutory status of hunting in the Jamaica Bay Unit of Gateway.

### b. Hunting under the Enabling Act

The Gateway National Recreation Area was created by federal statute, codified at 16

U.S.C. § 460cc et seq. ("Gateway Enabling Act"). This statute defines Gateway's boundaries

and divides it into several geographic units, including the Jamaica Bay Unit. 16 U.S.C. § 460cc.

In addition, it provides for Gateway's administration by the Secretary of the Interior. 16 U.S.C.

§ 460cc-2. The Secretary is instructed to "utilize such statutory authority available to him for the

conservation and management of wildlife and natural resources as he deems appropriate to carry

out the purposes of this subchapter." Id. at (a). The Secretary is further instructed to "administer

and protect the islands and waters within the Jamaica Bay Unit with the primary aim of conserving the natural resources, fish, and wildlife located therein and shall permit no development or use of this area which is incompatible with this purpose." Id.

The statute also specifically addresses the status of hunting within Gateway in the following terms:

> The Secretary *shall* permit hunting, fishing, shellfishing, trapping, and the taking of specimens on the lands and waters under his jurisdiction within the Gateway National Recreation Area in accordance with the applicable laws of the United States and the laws of the States of New York and New Jersey and political subdivisions thereof, except that the Secretary may designate zones where and establish periods when these activities may not be permitted for reasons of public safety, administration, fish or wildlife management, or public use and enjoyment.

Id. at (f) (emphasis added).

The relevant provision of the Gateway Enabling Act begins with the mandatory language "[t]he Secretary shall permit hunting." Id. This would initially suggest that hunting in Gateway is regulated by 36 C.F.R. § 2.2(b)(1), supra, and thus "shall be allowed." The government argues that the additional language in the Gateway Enabling Act providing that "the Secretary may designate zones where and establish periods when these activities may not be permitted" means that hunting is merely "authorized as a discretionary activity," and thus Gateway is governed by 36 C.F.R. § 2.2(b)(2), and hunting is allowed only if authorized by the park superintendent. There are several problems with this interpretation.

First, the language in the Gateway Enabling Act authorizing the Secretary to restrict hunting is entirely consistent with hunting in Gateway being "specifically mandated by Federal statutory law." 36 C.F.R. § 2.2(b)(1). The very next paragraph under 36 C.F.R. § 2.2 imposes procedural requirements on park superintendents when "*restricting hunting* and trapping or

7

closing park areas to the taking of wildlife where such activities are *mandated* or authorized by Federal statutory law." 36 C.F.R. § 2.2(c) (emphasis added).[6] If the existence of the Secretary's authority to restrict hunting in a particular park meant that hunting could not be "mandated by federal law," then the "mandated" language of 36 C.F.R. § 2.2(c) would be entirely superfluous.

Second, this interpretation fails to give any meaning to Congress's decision to use the word "shall" in some enabling acts and "may" in others. Congress has authorized hunting in the enabling acts of numerous national parks, sometimes by directing that the Secretary of the Interior "shall permit hunting"[7] and sometimes indicating that the Secretary "may permit hunting."[8] The important significance of that linguistic difference is reflected in the words "shall" and "mandated" in § 2.2(b)(1) and "may" and "authorized as discretionary" in § 2.2(b)(2). When Congress uses different words in similar statutes, the difference is presumed to be meaningful. Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006) ("We normally presume that, where words differ as they differ here, Congress acts intentionally and

---

[6] The specific procedural requirements that 36 C.F.R. § 2.2(c) imposes on park superintendents when restricting hunting are discussed in more detail below.

[7] See, e.g., 16 U.S.C. § 90c-1 (North Cascades National Park); 16 U.S.C. § 230d (Jean Lafitte National Historical Park and Preserve); 16 U.S.C. § 410aaa-46 (Mojave National Preserve); 16 U.S.C. § 410fff-5 (Black Canyon of the Gunnison National Park); 16 U.S.C. § 410hhh-5 (Great Sand Dunes National Park and Preserve); 16 U.S.C. § 459e-4 (Fire Island National Seashore); 16 U.S.C. § 459f-4 (Assateague Island National Seashore); 16 U.S.C. § 459g-3 (Cape Lookout National Seashore); 16 U.S.C. § 459h-2 (Gulf Islands National Seashore); 16 U.S.C. § 459i-4 (Cumberland Island National Seashore); 16 U.S.C. § 459j-3 (Canaveral National Seashore); 16 U.S.C. § 460m-4 (Ozark National Scenic Riverways); 16 U.S.C. § 460m-10 (Buffalo National River); 16 U.S.C. § 460m-20 (New River Gorge National River); 16 U.S.C. § 460n-4 (Lake Mead National Recreation Area); 16 U.S.C. § 460o-5 (Delaware Water Gap National Recreation Area); 16 U.S.C. § 460q-4 (Whiskeytown-Shasta-Trinity National Recreation Area); 16 U.S.C. § 460s-4 (Pictured Rocks National Lakeshore); 16 U.S.C. § 460t-3 (Bighorn Canyon National Recreation Area); 16 U.S.C. § 460w-4 (Apostle Islands National Lakeshore); 16 U.S.C. § 460x-4 (Sleeping Bear Dunes National Lakeshore); 16 U.S.C. § 460y-4 (King Range National Conservation Area); 16 U.S.C. § 460dd-4 (Glen Canyon National Recreation Area); 16 U.S.C. § 460ee (Big South Fork National River and Recreation Area); 16 U.S.C. § 460hh-2 (Chickasaw National Recreation Area); 16 U.S.C. § 460uu-22 (El Malpais National Conservation Area); 16 U.S.C. § 460ww-1 (Gauley River National Recreation Area); 16 U.S.C. § 460ccc-2 (Red Rock Canyon National Conservation Area); 16 U.S.C. § 460eee-1 (Lake Meredith National Recreation Area); 16 U.S.C. § 460fff-1 (Amistad National Recreation Area); 16 U.S.C. § 460nnn-23 (Steens Mountain Cooperative Management and Protection Area); see also 16 U.S.C. § 460mmm-4 (Mcinnis Canyons National Conservation Area, "[h]unting . . . shall be allowed"); 16 U.S.C. § 460ooo-4 (Las Cienegas National Conservation Area — Arizona, "[h]unting shall be allowed").

[8] See, e.g., 16 U.S.C. § 410fff-3 (privately owned lands within Black Canyon of the Gunnison National Park); 16 U.S.C. § 459b-6 (Cape Cod National Seashore); 16 U.S.C. § 459c-6 (Point Reyes National Seashore).

purposely in the disparate inclusion or exclusion." (internal quotations omitted)). This is

particularly true when Congress chooses between mandatory and permissive language. See

Lopez v. Davis, 531 U.S. 230, 241 (2001). Other courts have given weight to this distinction in

the context of 36 C.F.R. § 2.2(b). See United States v. Lofton, 233 F.3d 313, 316 (4th Cir.

2000).

The government assigns great weight to the exception in the Gateway Enabling Act

which allows the Secretary to restrict hunting. The Court has reviewed the statutes authorizing

hunting in dozens of federal parks, and those statutes which direct that the Secretary of the

Interior "shall permit" hunting contain, without exception,[9] language similar to that in the

Gateway Enabling Act authorizing the Secretary to impose restrictions. Interpreting the

regulation in the manner the government advocates would make 36 C.F.R. § 2.2(b)(1) a nullity,

as no parks would exist that specifically "mandate" hunting. Courts should avoid interpreting

statutes or regulations in a manner that would neuter their provisions. Duncan v. Walker, 533

U.S. 167, 174 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal

quotations omitted)).

Third, the reading of 36 C.F.R. § 2.2(b) advocated by the government is contrary to the

Gateway Enabling Act. The Gateway Enabling Act and numerous other similar enabling acts are

explicit in providing that hunting "shall [be] permit[ted]" subject to restrictions that the Secretary

---

[9] The Court has identified two statutes, 16 U.S.C. § 460nn-3 (Robert T. Stafford White Rocks National Recreation Area), 16 U.S.C. § 460rr-2 (Pine Ridge National Recreation Area), which instruct that the Secretary "shall permit" hunting but do not grant the authority to make exceptions, however, both of these parks are administered by the Secretary of Agriculture, not the Secretary of the Interior, and thus are not subject to 36 C.F.R. § 2.2(b). See 16 U.S.C. § 1c ("The 'national park system' shall include any area of land and water now or hereafter administered by the Secretary of the Interior through the National Park Service for park, monument, historic, parkway, recreational, or other purposes.").

"may" impose. The application of 36 C.F.R. § 2.2(b)(2) to Gateway would prohibit hunting by default, subject only to exceptions that the Superintendent "may" allow — precisely the opposite of what was provided in the Enabling Act. Administrative regulations should not be interpreted in a way that conflicts with the text of the statutes those regulations implement — at least not where another reasonable interpretation is available.

Finally, the interpretation endorsed by Knauer allows the regulatory and statutory schemes to be read together harmoniously. A review of the enabling acts of parks administered by the Secretary of the Interior reveals a number of parks in which hunting has been prohibited by statute,[10] others in which the statute directs that the Secretary "shall permit" hunting subject to exceptions,[11] and others in which the statute directs that the Secretary "may permit" hunting.[12] The regulations codified in 36 C.F.R. §§ 2.1 and 2.2 make sense of this division by first enacting a default rule prohibiting hunting, 36 C.F.R. § 2.1(a)(1)(i), and then recognizing exceptions for those areas where hunting is mandated or authorized as a discretionary activity by statute, 36 C.F.R. § 2.2(b). This is further confirmed by the National Park Service's commentary explaining 36 C.F.R. § 2.2(b) when it was first proposed:

> In cases where the legislation for a park area does not authorize hunting or trapping, the taking of wildlife is prohibited. If the legislation for a park area authorizes hunting or trapping on a discretionary basis, special regulations for the park area will be required in order to implement a hunting or trapping program. The process of developing special regulations will require the preparation of an environmental assessment and an opportunity for public comment. In those park areas where the legislation directs that

---

[10] See, e.g., 16 U.S.C. § 26 (Yellowstone National Park); 16 U.S.C. § 60 (Sequoia and Yosemite National Parks); 16 U.S.C. § 98 (Mount Rainier National Park); 16 U.S.C. § 117c (Mesa Verde National Park); 16 U.S.C. § 127 (Crater Lake National Park); 16 U.S.C. § 170 (Glacier National Park); 16 U.S.C. § 198c (Rocky Mountain National Park); 16 U.S.C. § 204c (Lassen Volcanic National Park); 16 U.S.C. § 256b (Olympic National Park); 16 U.S.C. § 395c (Hawaii National Park); 16 U.S.C. § 403c-3 (Shenandoah National Park); 16 U.S.C. § 403h-3 (Great Smoky Mountains National Park); 16 U.S.C. § 404c-3 (Mammoth Cave National Park); 16 U.S.C. § 408k (Isle Royale National Park).

[11] See supra statutes listed in note 7.

[12] See supra statutes listed in note 8.

10

hunting or trapping be permitted, the Service will implement the types of restrictions
necessary to ensure resource protection and public safety.

47 Fed. Reg. 11598, 11601 (Mar. 17, 1982). The commentary thus describes § 2.2(b) as

distinguishing between legislation that "authorizes hunting or trapping on a discretionary basis"

and legislation that "directs that hunting or trapping be permitted." Since the Gateway Enabling

Act explicitly states that "the Secretary shall permit hunting," Gateway is governed by

§ 2.2(b)(1).[13] 16 U.S.C. § 460cc-2(f).

The Gateway Enabling Act authorizes hunting, and thus §§ 2.1–2.2 do not, by

themselves, prohibit Knauer's conduct. This authorization is limited, however, to such hunting

as is "in accordance with the applicable laws of the United States and the laws of the States of

New York and New Jersey" and carves out an exception for "zones where and . . . periods when

these activities may not be permitted." 16 U.S.C. § 460cc-2(f). Thus, Knauer's conduct was

legal only if it was in accordance with state law, it was otherwise in accordance with federal law,

and it had not been validly prohibited by the Secretary of the Interior. The Court will turn to

these questions now.

### c. Compliance with State Law

It is undisputed that Knauer was in complete compliance with state law. Knauer

possessed a valid commercial fishing license from New York State. His license included a crab

fishing permit, which in turn permitted the taking of horseshoe crabs.[14] At the time he was

---

[13] The efforts by the superintendent of the Jamaica Bay Unit to promulgate regulations prohibiting hunting in the
Jamaica Bay Unit further support the determination that Gateway is governed by 36 C.F.R. § 2.2(b)(1). If Gateway
were governed by § 2.2(b)(2), then hunting would be prohibited by default absent regulations specifically
authorizing it, and thus the park superintendent's regulations would have been entirely superfluous.

[14] The magistrate judge held that Knauer's possession of New York state permits was without effect in a national
park because "[u]nder the Supremacy Clause, federal law supercedes conflicting state law." Knauer, 635 F. Supp.
2d at 207 n.3. This argument has no force when dealing with statutes and regulations that explicitly incorporate
state law. 16 U.S.C. § 460cc-2(f) ("The Secretary shall permit hunting . . . in accordance with . . . the laws of the

confronted by Park Police, Knauer had caught approximately 50–80 horseshoe crabs; he was permitted under his New York license, to take up to 500 crabs per day during the horseshoe crab season. Knauer was issued a summons several days before the end of horseshoe crab season. Furthermore, Knauer was catching horseshoe crabs with a gaff, a pole with a hook used to raise the crabs out of the water. The use of a gaff is classified as hand fishing under New York law and is a permitted method of catching horseshoe crabs. Knauer's compliance with New York law is undisputed.

### d. Ban on Commercial Activity

The government has alleged that Knauer was catching horseshoe crabs in violation of 36 C.F.R. § 5.3, which prohibits:

> Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited.

Because Knauer was operating in conformity with a commercial fishing license, and stated that he was catching horseshoe crabs to "earn a living," the government contends that he was engaged in business and thus in violation of § 5.3. This in turn, the government argues, places him in violation of § 2.1(a)(1)(i) because his activity was not otherwise authorized by federal law.

In support of this view, the government and the magistrate judge cite <u>United States v. Duffy</u>, 479 F.2d 1038 (2d Cir. 1973), in which the Second Circuit upheld a conviction for commercial fishing in a national park under § 5.3, despite the existence of other regulations

States of New York and New Jersey . . . ."): 36 C.F.R. § 2.2(b)(4) ("Where hunting or trapping or both are authorized, such activities shall be conducted in accordance with Federal law and the laws of the State within whose exterior boundaries a park area or a portion thereof is located. Nonconflicting State laws are adopted as a part of these regulations.").

permitting fishing generally. In Duffy, the Court held that "[i]t is the business activity, not the fishing, which the regulation prohibits." Duffy, 479 F.2d at 1039. In other words, the fact that Duffy's conduct was commercial did not make his fishing illegal under an enabling act that required his conduct to be "in accordance with the laws of New York and the United States of America." 16 U.S.C. § 459e-4 (Fire Island National Seashore hunting and fishing regulations). Duffy was convicted only because he had violated § 5.3. Here, however, Knauer was not charged with a violation of § 5.3. Even if he could have been convicted for violating § 5.3 had he been charged under it,[15] this has no effect on his liability under § 2.1(a)(1)(i).

The government has not alleged that Knauer was in violation of any statute or regulation enacted by the Secretary of the Interior other than those already mentioned. Thus, the government must rely on the regulations enacted by the Superintendent of the Jamaica Bay Unit of Gateway under the authority delegated by the Secretary of the Interior. The Court will now consider the effect of these regulations.

### 3. Conviction on a Theory not Presented at Trial

Knauer argues that he cannot be convicted on the basis of the Compendium regulation, because the government never argued before or during the trial that this regulation supported his conviction. Indeed, although the government now argues that this regulation explicitly bans the taking of horseshoe crabs within the Jamaica Bay Unit, the government never once mentioned

---

[15] It appears likely that he would have been liable under § 5.3. The Duffy court held that a specific regulatory authorization of fishing did not supersede the general prohibition on commercial activities. Duffy, 479 F.2d at 1039; but see id. at 1040 (Anderson, J., dissenting).

the existence of this regulation until *after* it was cited by the magistrate judge in support of Knauer's conviction.[16]

It is well established that after a jury trial, a criminal conviction cannot be upheld on the basis of a theory not presented to the jury. McCormick v. United States, 500 U.S. 257, 269-70 (1991); Chiarella v. United States, 445 U.S. 222, 236 (1980); Dunn v. United States, 442 U.S. 100, 106 (1979); Rewis v. United States, 401 U.S. 808, 814 (1971); Cole v. Arkansas, 333 U.S. 196, 201 (1948); United States v. Ness, 565 F.3d 73, 79 (2d Cir. 2009); United States v. Plaza Health Labs., Inc., 3 F.3d 643 (2d Cir. 1993). These decisions, by highlighting the role of the

---

[16] The only evidence at trial related to the Compendium was testimony by Superintendent Eckert. Her discussion of the Compendium, in its entirety, follows:

> Q: And what, if any, other responsibilities do you have with regards to the rules and regulations of the park?
> A: There are opportunities where I interpret those laws and regulations. If, for instance, the code of Federal regulations has a stipulation about the superintendent may further authorize something, then I can do so and put that into a document called a compendium.
> Q: And what exactly is the compendium?
> A: The superintendent's compendium fine tunes more of what's in the code of Federal regulations.
> Q: And what, if anything, can you do if a law is confusing or ambiguous?
> A: The superintendent's compendium would clarify something that might be in the regulation that says the superintendent has authority to change the hours of this area of the park. So, I have — discretionary authority, is the name of that authority.

Trial Transcript ("Trial Tr."), dated Apr. 23, 2008, at 94:24–95:15. There was no further mention of the Compendium during the trial, nor is there any indication that any Compendium regulation existed that was relevant to Knauer's conviction.

At oral argument, the government contended that, while the above exchange was the only mention of the *Compendium*, the Superintendent subsequently referenced regulations enacted to prohibit the hunting of horseshoe crabs, and hunting generally, in the Jamaica Bay Unit. This contention is entirely unsupported by the trial record, and, in fact, the Superintendent's actual testimony was more nearly the opposite.

The following exchange occurred between the government and the Superintendent regarding the effect of 36 C.F.R. § 2.2:

> Q: Okay. And could you briefly explain what this section provides?
> A: This is the section that also discusses wildlife is protected. However, hunting may be allowed, but there's a certain stipulation to that. And there needs to be a law — the regulation needs to specifically say, and it can't be in contradiction to any state laws.
> *Q: Okay. And just to clarify, is there such a law on the books that you know of?*
> *A: For Gateway National Recreation Area? There's no specific law.*
> Q: And so, as it says here, is the taking of wildlife or hunting permitted at Gateway?
> A: It is not.

Trial Tr. 104:3–16 (emphasis added). The Superintendent implicitly endorses the position that Gateway is governed by 36 C.F.R. § 2.2(b)(2) and states that there is no regulation specific to Gateway which authorizes hunting. This is a far cry from referencing a hunting prohibition promulgated by the Superintendent. In fact, it seems more natural to read the Superintendent's language as suggesting that there are no relevant regulations specific to Gateway and that only the Secretary's regulations are implicated. The government's brief similarly mischaracterized this testimony, stating that "Superintendent Eckert prohibited hunting horseshoe crabs in the Jamaica Bay Unit." Gov't Br. 5.

jury, implicitly invoke the Sixth Amendment right to a jury trial, which would not be applicable in a bench trial like this case.[17]

On the other hand, these cases also emphasize core due process concerns which would be implicated just as strongly in a case tried before a judge. "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." Cole, 333 U.S. at 201; see also Dunn, 442 U.S. at 106 ("Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused.").

Here, the government's case, both before and during trial, rested entirely on the theory that the Gateway Enabling Act, together with the Secretary's regulations applicable to the National Parks generally, had the effect of proscribing Knauer's conduct, without reference to any authority delegated to the Jamaica Bay Superintendent, or any regulations specific to the Jamaica Bay Unit.[18] The theory that Knauer's conviction could be upheld based on a regulation issued by the Superintendent and contained in the Compendium made its very first appearance in the magistrate judge's opinion after her *sua sponte* post-trial request for a copy of the Compendium from the government.[19] Knauer had no opportunity to challenge the government's

---

[17] Another rationale underlying some of these cases is the principle that an appellate court should not affirm a conviction on grounds not considered by the trial court. See also Eaton v. City of Tulsa, 415 U.S. 697, 698–99 (1974) (refusing to affirm contempt finding on grounds different from those cited by the trial judge). This argument would not come into play here where the government asks this Court to affirm on the basis of a theory that, although it was not presented at trial, was relied upon by the trial judge to convict Knauer.

[18] After trial, the government has continued to argue that Knauer's conviction may be upheld without regard to any regulations adopted by the Superintendent of the Jamaica Bay Unit. But the government also argues that the Compendium regulation independently supports Knauer's conviction.

[19] "Exercising her discretionary authority, the Superintendent of the Jamaica Bay Unit issued rules prohibiting hunting and the taking of horseshoe crabs in the Jamaica Bay Unit." Knauer, 635 F. Supp. 2d at 208.

theory at trial, or even to establihs whether the regulation in question was the appropriate governing law.[20]

Because the conviction on a legal theory that the defendant had no opportunity to contest violates due process, the magistrate judge's judgment must be reversed. Although there is some authority for the proposition that the case should be remanded for a new trial in which Knauer would have an opportunity to contest his conviction on the basis of the Compendium regulation, in this case, as described below, the Court finds as a matter of law that the Compendium regulation cannot support Knauer's conviction, and thus no remand is necessary.

### 4. Effect of Compendium Regulation

By regulation, the Secretary has delegated authority to manage individual park areas to park superintendents. A superintendent is defined as "the official in charge of a park area or an authorized representative thereof." 36 C.F.R. § 1.4(a). At the time of Knauer's summons and at the time of his trial, the Jamaica Bay Unit of Gateway was administered by Superintendent Lisa Eckert ("the Superintendent"). The Superintendent is empowered by several regulatory provisions to enact restrictions on the use of the park. These regulations are periodically published in a compendium.

Assuming, *arguendo*, that the version of the Compendium relied on by the magistrate judge was the law in effect at the time of Knauer's summons,[21] the Court finds that the regulation purporting to ban the hunting of horseshoe crabs within the Jamaica Bay Unit is void as an invalid exercise of the Superintendent's delegated regulatory authority.

---

[20] The government criticizes Knauer for his failure to challenge the validity of the Compendium regulation at trial. Gov't Br. 26 n.13. Such a criticism is ironic in light of the fact that the government never once mentioned the regulation at trial or in pre-trial filings, let alone relied on it as a basis of conviction.

[21] This assumption is addressed more critically below.

### a. Authority under § 2.2(d)

The Compendium contains a regulation directed specifically at the hunting of horseshoe crabs, stating:

36 CFR § 2.2 — WILDLIFE PROTECTION

(d) The transporting of lawfully taken wildlife through the park is permitted under the following conditions and procedures:

• Hunting is prohibited within the Jamaica Bay Unit

• *The taking of terrapin turtles and horseshoe crab are prohibited throughout the Jamaica Bay Unit.*

Compendium, at 7 (emphasis added). The first thing to note is that the Compendium is quite explicit about the authority under which its various rules were enacted. For example, the first several pages of the Compendium consist of regulations implemented in accordance with the Superintendent's authority under 36 C.F.R. § 1.5(a) to impose limits on the use of park areas. The prohibition on the taking of horseshoe crabs[22] appears in the Compendium under the authority of 36 C.F.R. § 2.2(d), which provides:

The superintendent may establish conditions and procedures for transporting lawfully taken wildlife through the park area. Violation of these conditions and procedures is prohibited.

The regulation promulgated in the Compendium by the Superintendent does not even arguably come within the authority granted by § 2.2(d). The regulation allows restrictions on the transportation of lawfully taken wildlife. It provides no authority for the restrictions on the taking of wildlife itself; rather, it is addressed only to the transportation of wildlife taken *lawfully*. The government contends that the regulation is a valid exercise of the Superintendent's

---

[22] At oral argument, the government also relied on the blanket hunting prohibition that immediately precedes the prohibition on taking horseshoe crabs. This is a brand new theory. It was not presented before or during trial, was not relied on (or mentioned) by the magistrate judge, was not argued in the government's brief, and the Court will certainly not entertain it for the first time now. It is worth noting, however, that this regulation suffers from all the same infirmities as the regulation prohibiting the taking of horseshoe crabs.

authority under § 2.2(d), but gives no explanation beyond the curious "lesser-power-includes-the-greater" argument that "it is reasonable to prohibit hunting and taking horseshoe crabs under § 2.2(d) because the prohibition qualifies which items can be lawfully transported." Gov't Br. 13. Even if the Court were to charitably construe the government's argument as suggesting that the Compendium regulation be read to bar only the *transport* of horseshoe crabs, this would not provide a basis for the prosecution of Knauer as he was not charged with the illegal transportation of wildlife.[23]

Finally, the Superintendent is explicitly given the authority to restrict uses of the park under a different provision, 36 C.F.R. § 1.5(a). While restrictions on the transportation of lawfully taken wildlife under § 2.2(d) appear to be entirely discretionary, the exercise of authority under § 1.5(a) is subject to several procedural requirements. Furthermore, another code provision, § 2.2(c), explicitly addresses the use of § 1.5(a) to restrict hunting, and imposes an additional procedural requirement before such power may be exercised. If the Superintendent were allowed to restrict hunting by exercising her purely discretionary authority under § 2.2(d), it would render the more restrictive procedural requirements of §§ 1.5 and 2.2(c) nullities.[24]

### b. Authority under §§ 1.5(a) and 2.2(c)

Despite the explicit language and placement of the horseshoe crab regulation in the Compendium, the magistrate judge held, and the government argues, that the rule was a valid exercise of the Superintendent's authority under §§ 1.5(a) and 2.2(c). The Secretary has

---

[23] Knauer also argues that this reading is implausible. According to him, fishermen who legally catch horseshoe crabs in New York State waters routinely pass through Gateway when returning to dock, and the Superintendent could not have intended to ban this passage. Def.'s Br. 23 n.14. The Court need not consider this question because Knauer was not charged with illegal transportation of wildlife under § 2.2(d).

[24] Cf. 47 Fed. Reg. 11598, 11599 (Mar. 17, 1982) ("Each of the five categories of controls [under § 1.5(a)] serves a specific purpose. A visiting hour restriction, for example, may not be imposed for the purpose of achieving an activity restriction. Similarly, activity restrictions may not be imposed to such a degree that they will, in effect, result in the closure of an area to all use.").

delegated to park superintendents authority to limit the permissible uses of parks, including by closing a park area entirely to designated activities:

> (a) Consistent with applicable legislation and Federal administrative policies, and based upon a determination that such action is necessary for the maintenance of public health and safety, protection of environmental or scenic values, protection of natural or cultural resources, aid to scientific research, implementation of management responsibilities, equitable allocation and use of facilities, or the avoidance of conflict among visitor use activities, the superintendent may:
>
>> (1) Establish, for all or a portion of a park area, a reasonable schedule of visiting hours, impose public use limits, or close all or a portion of a park area to all public use or to a specific use or activity.
>>
>> (2) Designate areas for a specific use or activity, or impose conditions or restrictions on a use or activity.
>>
>> (3) Terminate a restriction, limit, closure, designation, condition, or visiting hour restriction imposed under paragraph (a)(1) or (2) of this section.

36 C.F.R. § 1.5(a). Under the plain language of this regulation, the Superintendent has the authority to close the Jamaica Bay Unit to the hunting of horseshoe crabs. Except in emergencies, however, the exercise of this authority is subject to several procedural prerequisites.

First, under § 2.2(c) the Superintendent must "consult with appropriate State agencies" prior to implementing a restriction on hunting. Second, § 1.7(a) requires that the Superintendent provide public notice of any restriction on park uses under the authority of § 1.5(a). Third, § 1.5(b) requires that significant or controversial use restrictions be published in the federal register. Finally, § 1.5(c) requires that the Superintendent "prepare a written determination justifying the action" prior to implementing use restrictions. The Superintendant has not

complied with the last two of these requirements, and it is not at all clear that she has complied with any of them.[25]

## i. Consultation with State Agencies

Under 36 C.F.R. § 2.2(c), the Superintendent is required to consult with state officials before implementing hunting restrictions:

> Except in emergencies or in areas under the exclusive jurisdiction of the United States, the superintendent shall consult with appropriate State agencies before invoking the authority of § 1.5 for the purpose of restricting hunting and trapping or closing park areas to the taking of wildlife where such activities are mandated or authorized by Federal statutory law.

The appropriate New York state agency is the New York State Department of Environmental Conservation ("DEC"). At trial, Kim McKown, the Crustacean Unit leader at the DEC testified regarding New York State's regulation of the taking of horseshoe crabs and Mr. Knauer's compliance with New York law. When asked about the legality of catching horseshoe crabs within federal waters, McKown replied that she did not know.[26] As she is the individual directly responsible for the regulation of horseshoe crabs in the relevant state agency, see Trial Tr. 58:23-59:5, she is presumably the person with whom the Superintendent was required to consult under § 2.2(c). The fact that she was entirely unfamiliar with the regulation of horseshoe

---

[25] It is worth noting that none of these requirements apply to regulations on transportation of wildlife promulgated under the authority of § 2.2(d). The failure to follow these procedural steps reinforces the Court's belief that § 2.2(d) and only § 2.2(d) is the appropriate authority under which to analyze the horseshoe crab regulation.
[26] The full exchange was as follows:

Q: Okay. Do DEC permits allow for a holder to commercially fish for horseshoe crabs in Federal water?
MR. MOULTER: Objection, Your Honor.
THE COURT: Do you know regarding the fishing in Federal waters?
THE WITNESS: No.
THE COURT: Regulations regarding Federal waters?
THE WITNESS: No.
THE COURT: It's sustained.

Trial Tr. 68:24-69:7.

crabs within Gateway is at least circumstantial evidence that the Superintendent did not engage in the required consultation.

It is of course possible that the regulation was put in place before McKown held this position,[27] or that some other appropriate person at DEC was consulted, or even that McKown was consulted and has since forgotten. Unfortunately, because Knauer was provided no opportunity to contest the Compendium regulation at trial, the record is not fully developed on this point.

## ii. Public Notice

The Superintendent must also provide public notice of any use restrictions promulgated under § 1.5(a):

> Whenever the authority of § 1.5(a) is invoked to restrict or control a public use or activity, to relax or revoke an existing restriction or control, to designate all or a portion of a park area as open or closed, or to require a permit to implement a public use limit, the public shall be notified by one or more of the following methods:
>
> (1) Signs posted at conspicuous locations, such as normal points of entry and reasonable intervals along the boundary of the affected park locale.
>
> (2) Maps available in the office of the superintendent and other places convenient to the public.
>
> (3) Publication in a newspaper of general circulation in the affected area.
>
> (4) Other appropriate methods, such as the removal of closure signs, use of electronic media, park brochures, maps and handouts.

36 C.F.R. § 1.7(a). See also 36 C.F.R. § 1.5(e) ("Except in emergency situations, the public will be informed of . . . use or activity restrictions . . . in accordance with § 1.7 of this chapter.").

---

[27] Although the parties dispute the date of the initial promulgation of this regulation, see below, the earliest date that has been cited in this litigation is May 25, 2007. McKown testified that she has been at DEC for twenty-two years, but it is not clear how long she has been the Crustacean Unit leader.

The only evidence of public notice presented at trial or referenced by the government is a park brochure containing broad language concerning the preservation of natural resources: "**All natural and cultural resources, including wildlife, rocks, plants and structures are protected by federal law. Do not disturb or destroy.**" This language is clearly insufficient to satisfy the requirements of § 1.7(a). First, it gives no notice of the specific restrictions instituted by the Superintendent, including the purported ban on the taking of horseshoe crabs. The notice envisioned by § 1.7(a) is required for every park restriction *and* for the removal of a restriction — that is, the regulation requires that any *change* in park regulations be publicized. There is no information in the record concerning how frequently park brochures are updated, but it is difficult to imagine that such a vaguely worded statement could give any notice that park rules had changed. Second, if construed as legal notice of the regulations governing the Jamaica Bay Unit, the brochure's statement is flatly inaccurate as a matter of law. The brochure indicates that all natural resources within the park are protected and instructs visitors not to disturb them. Yet, the Jamaica Bay Compendium expressly allows the taking of certain natural specimens, for example: the collection of dead wood for campfires in designated areas, Compendium 36 C.F.R. § 2.1(a)(4); the collection of unoccupied seashells and up to a gallon per person per day of edible fruits, nuts, berries, and mushrooms, Compendium 36 C.F.R. § 2.1(c); and the taking of minnows and shrimp in designated areas, Compendium 36 C.F.R. § 2.3(a). The park brochure neither accurately informs the public concerning permissible uses of the park nor gives notice of changes in the allowed uses. To hold that § 1.7(a) is satisfied by such a vague statement entirely vitiates the public notice requirement and utterly fails to "provide for consistent and effective public notification of the imposition of a closure or other restriction or control." 47 Fed. Reg. 11598, 11599 (Mar. 17, 1982).

22

Furthermore, the public availability of the Compendium does not satisfy the public notice requirement of § 1.7(a).[28] Under § 1.7(b), the issuance of the Compendium is mandated "*[i]n addition* to the above-described [in § 1.7(a)] notification procedures" (emphasis added). It is of course possible that public notice was adequately provided by other publications apart from the brochure introduced at trial,[29] but again, because Knauer was provided no opportunity to contest the Compendium regulation at trial, the record is not fully developed on this point.

### iii. Publication in the Federal Register

The Superintendent is required, under 36 C.F.R. § 1.5(b), to publish certain regulations promulgated pursuant to § 1.5(a), including, among others, those that "result in a significant alteration in the public use pattern of the park area" or are "of a highly controversial nature," in the Federal Register:

> Except in emergency situations, a closure, designation, use or activity restriction or condition, or the termination or relaxation of such, which is of a nature, magnitude and duration that will result in a significant alteration in the public use pattern of the park area, adversely affect the park's natural, aesthetic, scenic or cultural values, require a long-term or significant modification in the resource management objectives of the unit, or is of a highly controversial nature, shall be published as rulemaking in the Federal Register.

The government has argued that restrictions on hunting do not fall within any of the specified categories. Knauer, on the other hand, argues that hunting restrictions are precisely the sort of restrictions of which the public must be informed. Knauer cites a number of cases in which the regulation of hunting in the national parks was contested as evidence of the controversial nature of hunting restrictions. See Fund for Animals v. Mainella, 294 F. Supp. 2d

---

[28] The parties contest whether the Compendium was in fact publicly available.
[29] At oral argument, in support of its argument that the notice requirement of § 1.7(a) had been satisfied, the government cited only this brochure.

46 (D.D.C. 2003); <u>Mich. United Conservation Clubs v. Lujan</u>, 949 F.2d 202, (6th Cir. 1991);

<u>Mo. Trappers Ass'n v. Hodel</u>, No. S 86-0193C(D), 1987 WL 119731 (E.D. Mo. May 21, 1987);

<u>Nat'l Rifle Ass'n of Am. v. Potter</u>, 628 F. Supp. 903 (D.D.C. 1986); <u>Voyageurs Nat'l Park Ass'n

Defenders of Wildlife v. Arnett</u>, 609 F. Supp. 532 (D.C. Minn. 1985).

The Court notes that hunting and fishing are the only activities that are specifically

singled out for special treatment in the Secretary's regulations delegating authority to the

Superintendent to restrict the use of park areas. <u>See</u> 36 C.F.R. § 2.2(c) (requiring consultation

with state officials prior to restricting hunting); 36 C.F.R. § 2.3(c) (requiring consultation with

state officials prior to restricting fishing). Furthermore, of all the recreational activities for which

Gateway could potentially be used, hunting is one of only a very few that the Gateway Enabling

Act specifically instructs the Secretary to allow. 16 U.S.C.A. § 460cc-2 (f) ("The Secretary shall

permit hunting, fishing, shellfishing, trapping, and the taking of specimens."). The treatment of

hunting by both Congress and the Secretary seems flatly inconsistent with the idea that hunting

restrictions are so minor and uncontroversial that the Superintendent need not provide notice of

their restriction in the federal register.

### iv. Written Justification

Finally, before imposing restrictions under § 1.5(a), 36 C.F.R. § 1.5(c) requires the

Superintendent to prepare written determinations, available to the public upon request, justifying

those restrictions:

> Except in emergency situations, prior to implementing or terminating a restriction,
> condition, public use limit or closure, the superintendent shall prepare a written
> determination justifying the action. That determination shall set forth the reason(s) the
> restriction, condition, public use limit or closure authorized by paragraph (a) has been
> established, and an explanation of why less restrictive measures will not suffice, or in the

case of a termination of a restriction, condition, public use limit or closure previously established under paragraph (a), a determination as to why the restriction is no longer necessary and a finding that the termination will not adversely impact park resources. This determination shall be available to the public upon request.

The Superintendent complies with this requirement by including such written determinations in the Compendium, which states that "[w]ritten determinations, which explain the reasoning behind the Superintendent's use of discretionary authority, as required by Section 1.5(c), appear in this document identified by italicized print." Compendium 1. Such explanatory statements accompany the regulations listed under 36 C.F.R. § 1.5(a).[30] The ban on the taking of horseshoe crabs, listed under 36 C.F.R. § 2.2(d), is accompanied by no such written determination. It thus fails to comply with the procedural requirements imposed on the Superintendent's regulatory authority and is therefore invalid.

### 5. Judicial Notice of the Compendium Regulation

The Superintendent of the Jamaica Bay Unit of Gateway has the authority under regulations promulgated by the Secretary of the Interior to issue additional regulations governing the Jamaica Bay Unit. By regulation, the Superintendent is required to collect these regulations in a Compendium, updated annually. 36 C.F.R. § 1.7(b). After Knauer's trial, the government, at the magistrate judge's request, provided a copy of the Compendium alleged to have been in effect at the time of Knauer's summons. The magistrate judge took judicial notice of a regulation contained within this Compendium, and on that basis convicted Knauer of a violation of 36 C.F.R. § 2.1(a)(1)(i).

---

[30] It is questionable whether these determinations comply with the requirements of § 1.5(c). For example, a list of several dozen park closures — some closing specific park areas entirely, and others prohibiting only certain uses — is followed by a single sentence explaining that "[c]losures have been determined according to resource protection, operational capacity and visitor safety." Compendium 36 C.F.R. § 1.5(a)(1). This hardly seems to satisfy the requirement under § 1.5(c) that written determinations "shall set forth the reason(s) the restriction, condition, public use limit or closure authorized by paragraph (a) has been established, and an explanation of why less restrictive measures will not suffice," and is impossible to square with the goal of "provid[ing] a meaningful explanation of the reason the action was taken." 47 Fed. Reg. 11598, 11599 (Mar. 17, 1982).

Knauer argues that judicial notice of the Compendium was inappropriate under Rule 201 of the Federal Rules of Evidence. Under that rule, a court may take notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Although courts may generally take judicial notice of administrative regulations, Knauer argues that such notice is inappropriate in this case because "[t]he compendium's veracity and authenticity have been substantially called into question," Def.'s Br. 38, whereas judicial notice applies only "to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b).

As an initial matter, although both Knauer and the government cite Rule 201 as the governing standard, it does not apply. Rule 201, by its own terms applies only to so-called "adjudicative facts." Fed. R. Evid. 201(a) ("This rule governs only judicial notice of adjudicative facts."). The advisory note accompanying Rule 201 defines adjudicative facts narrowly as "simply the facts of the particular case." Fed. R. Evid. 201, Note to Subdivision (a). This is contrasted with both legislative facts which "are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," and other "non-adjudicative facts" such as "non-evidence facts [used] to appraise or assess the adjudicative facts of the case." Id. The lack of a rule governing judicial notice of legislative facts "renders inappropriate any limitation in the form of indisputability, any formal requirements of notice other than those already inherent in affording opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level." Id.

The advisory note further explains that Rule 201 was not intended to apply to questions which are characterized as matters of law rather than matters of fact stating that "the manner in which law is fed into the judicial process is never a proper concern of the rules of evidence but rather of the rules of procedure." Fed. R. Evid. 201, Note on Judicial Notice of Law; cf. Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."); Fed. R. Crim. P. 26.1 ("Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source — including testimony — without regard to the Federal Rules of Evidence."); see also United States v. Hernandez-Fundora, 58 F.3d 802, 812 (2d Cir. 1995) ("[W]hile courts may take judicial notice of either legislative or adjudicative facts, only notice of the latter is subject to the strictures of Rule 201.").[31]

The issue of what regulations were in effect in the Jamaica Bay Unit of Gateway at the time of Knauer's summons is a pure question of law, and thus is not governed by Rule 201, but rather by common law principles. Because it is a question of law, this Court reviews the magistrate judge's determination *de novo*, rather than under a clearly erroneous standard. Cf. Lockhart v. McCree, 476 U.S. 162, 168 n.3 (1986) ("We are far from persuaded, however, that the "clearly erroneous" standard of Rule 52(a) applies to the kind of "legislative" facts at issue here.").

The magistrate judge cited a string of Supreme Court cases for the proposition that "courts may take judicial notice of the rules and regulations of an administrative agency,

---

[31] One prominent treatise criticizes the very terminology of "judicial notice of law," characterizing this historically "anomalous" idea as the result of "perverse doctrinal creep." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5102.1 (2d ed. 2005). Nevertheless, the concept and terminology are well established.

including in criminal cases." Knauer, 635 F. Supp. 2d at 206 n.2. This is undeniably true. It does not imply, however, that judicial notice of purported administrative regulations will be appropriate in all cases. In none of the cases cited by the magistrate judge is there an indication of any real dispute between the parties concerning either the authenticity or accuracy of the regulation in question. Rather, the cases establish that courts are not barred from considering administrative regulations by mere technicalities like the failure to formally introduce the regulation into evidence or to have it formally authenticated.

In this case, however, Knauer does not merely argue that the formal rules of evidence prevent the consideration of the Compendium, but, in fact, contests whether the version of the Compendium provided to the magistrate judge by the government is in fact the version in effect at the time of Knauer's summons. On the evidence presently before it, the Court has no way of definitively resolving this issue, but in light of the curious circumstances surrounding this Compendium's purported issuance, Knauer's argument is certainly not frivolous.

At the time of Knauer's trial, the version of the Jamaica Bay Compendium in effect was dated June 28, 2007.[32] This version of the Compendium included the regulation prohibiting the hunting of horseshoe crabs. Because this version post-dated Knauer's summons, the magistrate judge requested from the government the version of the Compendium then in effect. The government provided a substantively identical version of the Compendium dated May 25, 2007 — a mere four days before Knauer's summons.

A number of unexplained oddities surrounding this version of the Compendium give the Court serious pause. The government has provided no explanation as to why two compendia

---

[32] A new version of the Compendium, labeled 2010 and dated April 3, 2010, is now available at http://www.nps.gov/gate/parkmgmt/upload/2010%20GATE%20Compendium.pdf (last visited Apr. 20, 2010). This 2010 Compendium is discussed further below.

were issued by the Jamaica Bay Unit only a month apart.[33]  A comparison of the two compendia

by the Court has revealed that they are entirely identical with only two exceptions: (1) the May

25 Compendium is not signed by the Jamaica Bay Superintendent, but instead has the printed

words "Signature on File," and (2) the date is different.  It is difficult to understand why an

unsigned 2007 Compendium would be issued by the Jamaica Bay Unit on May 25, and then a

separate signed Compendium would be released, identical in every respect but dated a month

later.  It is especially odd in light of the fact that after releasing two compendia in quick

succession, no further update was issued until almost three years later.[34]

Unexpectedly, the newly issued 2010 Compendium gives more reason to doubt the

accuracy of the May 25, 2007 Compendium.  This 2010 Compendium is signed by the

Superintendent of Gateway and contains a separate section applying to each of three park units:

the Jamaica Bay Unit, the Sandy Hook Unit, and the Staten Island Unit.  Prior to the publication

of the 2010 Compendium, the regulations for the different park units were not combined in a

single Compendium.  Rather, separate compendia for the Jamaica Bay Unit and the Sandy Hook

Unit were available on the Gateway website (no Compendium for the Staten Island Unit was

available on the website).  These compendia were signed by the superintendents of the individual

park units, rather than by the Superintendent of Gateway.

The following text appears at the bottom of each page of the 2010 Compendium: "SOL

Review: A. Conte completed 07/27/2006 only minor date changes in 2007, 2008, 2009, 2010."

---

[33] Under 36 C.F.R. § 1.7(b), the Superintendent is instructed that the compendium "shall be updated annually." Both compendia were prominently labeled "2007."

[34] Knauer has represented that prior to trial he requested from Gateway the version of the Compendium in effect at the time of his summons, and was provided with the 1997 version.  If there was indeed no compendium issued between 1997 and 2007, then it seems exceedingly odd that the Jamaica Bay Unit would issue identical compendia a month apart after going ten years without issuing a new version.  Because neither the 1997 Compendium nor Knauer's correspondence with Gateway are in the record, the Court does not rely on this allegation in its analysis.

This would suggest that the regulations contained in the 2010 compendium, including the prohibition on the taking of horseshoe crabs, have been in place since at least July 2006. But there is strong reason to believe that this change history as inaccurate. As an initial matter, it is simply not true that only minor date changes have been made. The Court has discovered at least two substantive changes to the Jamaica Bay Unit regulations between the 2007 Compendium[35] and the 2010 Compendium. First, the 2007 Compendium includes a list of park locations in which the use of temporary shade structures is permitted. In the 2010 Compendium, one location, Floyd Bennett Field, has been removed from the list. Compendium 36 C.F.R. § 2.10(a). Second, the 2007 Compendium indicates that "[t]he use of personal water craft is prohibited, except in navigable channels," while the 2010 Compendium states simply that "[t]he use of personal water craft is prohibited." Compendium 36 C.F.R. § 3.3. Revealingly, the amended watercraft regulation in the published 2010 Compendium is immediately followed by what is presumably an internal comment which reads "(I believe we are back to no PWC [personal watercraft] at all)," suggesting that a process of revising the Compendium was underway. Furthermore, a different provision in the 2010 Compendium specifically directed at personal watercraft has not been updated, and reads "PWCs are prohibited within the Jamaica Bay Unit *except in navigable channels*" (emphasis added), and thus now contradicts the amended provision indicating a blanket prohibition.

In addition, the change history indicates that updated compendia were issued in 2008 and 2009. This too appears to be false as to the Jamaica Bay Unit. As the government has admitted, as of early 2010, the most recent version of the Compendium available online was the 2007 version, and no evidence has been presented that any 2008 or 2009 Jamaica Bay Compendium

---

[35] Because the May 25 and June 28 compendia are substantively identical in every respect, the Court refers to them collectively as the "2007 Compendium."

exists. In fact, except for the addition of the year "2010," the change history on the 2010 Compendium is identical to one found on the 2009 Compendium for the *Sandy Hook* Unit. It appears that it was simply cut-and-pasted from that earlier compendium and applied to the entire 2010 Compendium, despite the fact that prior to 2010 the compendia were released under the authority of separate unit superintendents and their releases do not appear to have been coordinated.

Gateway's questionable document management practices, specifically, the release of draft comments in a published regulation and the inclusion of a document history that did not accurately reflect changes to the regulations, cast even more doubt on the decision to accept uncritically that an unsigned version of the compendium provided to the government by Gateway was in fact the version in effect at the time of Knauer's summons.[36]

It is undoubtedly within this Court's authority to take judicial notice of agency regulations, including those issued by an administrative subunit. In this case, however, where the regulation in question was not brought to the Court's attention by the parties and the Court cannot without difficulty verify its authenticity, the Court will decline to take notice of it. See Cont'l Technical Servs., Inc. v. Rockwell Int'l Corp., 927 F.2d 1198, 1199 (11th Cir. 1991); Prudential Ins. Co. of Am. v. Carlson, 126 F.2d 607, 611 (10th Cir. 1942).

## CONCLUSION

---

[36] It is worth noting also that the Superintendent's silence at trial regarding the Compendium regulation is suggestive. If the horseshoe crab regulation was in effect at the time of Knauer's summons (and especially if it had been implemented only days earlier), it is surprising that the Superintendent failed to mention it once despite ample opportunity to do so. On the other hand, if the regulation had in fact been issued a month after Knauer's summons, then this silence is very understandable. Drawing attention to a new regulation passed in the immediate aftermath of Knauer's summons might have given rise to an inference that it was enacted in response to that arrest and might have suggested an awareness by the Superintendent that a legal loophole caused by the different classifications of horseshoe crabs by New York and the Secretary had potentially left Knauer's conduct unprohibited.

For the aforementioned reasons, defendant Knauer's conviction must be REVERSED and a judgment of acquittal must be entered.

SO ORDERED.

Dated:       Brooklyn, New York
             April 20, 2010

I. Leo Glasser
United States Senior District Judge